IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Phyllis Delores Hunter, | ) | C/A No.: 1:16-3450-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill,[1] Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this pro se action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this lawsuit.

I.      Relevant Background

A.      Procedural History

On October 25, 2012, Plaintiff protectively filed an application for DIB in which she alleged her disability began on October 3, 2012. Tr. at 185–91. Her application was denied initially and upon reconsideration. Tr. at 115–19 and 121–23. On February 27, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Colin Fritz. Tr. at 34–76 (Hr'g Tr.). The ALJ issued an unfavorable decision on April 9, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 20, 2016. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 52 years old at the time of the hearing. Tr. at 17. She completed high school. Tr. at 40. Her past relevant work ("PRW") was as a mail handler. Tr. at 64. She alleges she has been unable to work since December 3, 2012.[2] Tr. at 39–40.

2.      Medical History

Plaintiff presented to Geneva L. Hill, M.D. ("Dr. Hill"), on May 19, 2011, with complaints of joint pain and swelling, stiffness, and fatigue. Tr. at 311. She described a

_____

[2] At the beginning of the hearing, Plaintiff amended her alleged onset date to her fiftieth birthday. Tr. at 39–40.

constant achy, burning, sharp, shooting, throbbing, tingling, and numb feeling "all over" her body. *Id.* She endorsed morning stiffness that lasted for longer than two hours. *Id.* She stated her pain was exacerbated by sitting, standing, walking, overexertion, and stress. *Id.* She reported a 13-year history of diffuse arthralgia and myalgia that had worsened over the prior two-year period and had been accompanied by depression, anxiety, and frequent panic attacks. *Id.* Dr. Hill noted mild tenderness to palpation in the proximal interphalangeal and distal interphalangeal joints of Plaintiff's right hand; the proximal interphalangeal joints of her left hand; the hips bursa; the bilateral ankles; and the bilateral metatarsophalangeal joints. Tr. at 312–13. Plaintiff reported pain in her left hip bursa that radiated from her knee to her lateral thigh. Tr. at 312. Dr. Hill observed tender points at Plaintiff's bilateral lateral epicondyle, knee, and greater trochanter. *Id.* She noted no other abnormalities. Tr. at 312–14. She assessed polyarthralgia, abnormal lab test results, and insomnia. Tr. at 314–15. She indicated that fibromyalgia should be considered as a diagnosis because of the presence of some tender points, fatigue, and nonrestorative sleep. Tr. at 314. She stated that rheumatoid arthritis was not indicated based on the absence of swelling on physical exam. *Id.* She noted the tenderness over Plaintiff's hands and feet was characteristic of possible inflammation. *Id.* She prescribed Ultram and indicated Angela N. Stoller, FNP ("Ms. Stoller"), should consider referring Plaintiff for magnetic resonance imaging ("MRI") of her right wrist and hand and prescribing either Cymbalta, Neurontin, Lyrica, or Savella. *Id.*

On June 20, 2011, Dr. Hill noted that repeat lab work showed negative rheumatoid factor, but elevated C-reactive protein. Tr. at 318. She indicated Plaintiff demonstrated no

evidence of inflammation on physical examination. *Id.* She increased Plaintiff's dosage of Ultram. *Id.* She stated the reason for Plaintiff's elevated C-reactive protein was unknown, but that Plaintiff should have it tested again in six months. *Id.*

Plaintiff presented to Patrick B. Mullen, M.D. ("Dr. Mullen"), for a psychiatric evaluation on July 14, 2011. Tr. at 263. She reported crying spells, poor and nonrestorative sleep, ruminative thoughts, and anhedonia. *Id.* She indicated she had withdrawn from social activities. *Id.* She endorsed generalized aches and pains that were accompanied by difficulty concentrating. *Id.* She indicated that her psychiatric symptoms had not improved with the addition of Cymbalta. Tr. at 264. Dr. Mullen observed Plaintiff to have slow psychomotor speed; a depressed and generally anxious affect; normal hygiene and dress; normal orientation; intact memory; some difficulty concentrating; clear sensorium; appropriate, but somewhat scattered thought process and content; and normal intelligence. Tr. at 265. He assessed generalized anxiety disorder and moderate-to-severe depression. *Id.* He noted Plaintiff's job was associated with both physical and emotional stressors. *Id.*

Plaintiff followed up with Ms. Stoller on November 10, 2011. Tr. at 395. She complained of pain that was exacerbated by lifting and requested a referral to another rheumatologist. *Id.* Ms. Stoller observed that Plaintiff's blood pressure was elevated. Tr. at 396. She instructed Plaintiff to continue taking Enalapril, to rest, and to increase her water intake. *Id.* She prescribed Hydrochlorothiazide and referred Plaintiff to rheumatologist Allison S. Lipsey, M.D. ("Dr. Lipsey"). *Id.*

On January 19, 2012, Plaintiff reported elevated blood pressure and requested that Ms. Stoller complete paperwork for her employer. Tr. at 399. Her blood pressure was 140/80 mm/Hg. Tr. at 400. Ms. Stoller instructed Plaintiff continue to take Enalapril and Hydrochlorothiazide, to go home and rest, and to increase her water intake. *Id.* She refilled Xanax for anxiety. *Id.*

Plaintiff presented to Dr. Lipsey on February 9, 2012, with complaints of fatigue, myalgia, and pain. Tr. at 288. She described her pain as "all over" and aching, sharp, dull, shooting, flu-like, stabbing, and throbbing. *Id.* She rated her pain as sometimes being greater than 10 on a 10-point scale. *Id.* She indicated she experienced stiffness for two hours each morning. *Id.* She stated her symptoms were exacerbated by cold weather, walking, overexertion, riding in a car, sitting too long, emotional stress, and standing. *Id.* She indicated her pain was accompanied by joint pain, abnormal laboratory tests, joint swelling, fatigue, weakness, stiffness, rashes, and swelling of her lips. *Id.* She informed Dr. Lipsey that she had previously been evaluated by two rheumatologists and was "looking into disability based on her blood pressure because her work is just too strenuous." *Id.* Dr. Lipsey noted the following abnormalities on physical examination: blunted affect; mildly limited range of motion ("ROM") of the cervical spine with tenderness; and global tenderness to tender points. Tr. at 289–90. Her impressions were polyarthralgia, myalgia, fatigue, disturbed skin sensation, and abnormal C-reactive protein. Tr. at 290. She indicated she saw no signs of active inflammatory polyarthritis. *Id.* She recommended additional laboratory studies, prescribed Vitamin D, and advised Plaintiff to sleep, exercise, manage stress, and engage in reconditioning. *Id.* Dr. Lipsey

sent a follow up letter on February 22, 2012. Tr. at 296. She stated it was clear from Plaintiff's evaluation that she had suffered from a long-standing pain disorder. *Id.* Nevertheless, she stated that she only obtained objective evidence that Plaintiff had low vitamin D. *Id.* She recommended that Plaintiff seek treatment at a pain management center. *Id.*

On February 14, 2012, Plaintiff reported that she had returned to work and that her blood pressure had been elevated on work days. Tr. at 401. She reported gastrointestinal side effects with Cymbalta. *Id.* Ms. Stoller noted Plaintiff's blood pressure was elevated at 134/88 mm/Hg and that she had an anxious mood and affect. *Id.* She advised Plaintiff to continue Enalapril and Hydrochlorothiazide, to go home and rest, and to increase her water intake. Tr. at 402.

Plaintiff presented to Joseph Catanzaro, M.D. ("Dr. Catanzaro"), with a complaint of hair loss on the left superior parietal scalp on February 23, 2012. Tr. at 298. Dr. Catanzaro diagnosed alopecia areata and noted that Plaintiff had discrete non-scarring patches of hair loss distributed on the left parietal scalp. *Id.* He advised Plaintiff of treatment options that included intralesional steroids, topical steroids, and anthralin. *Id.* He informed Plaintiff that alopecia areata was an autoimmune disease that tended to respond well to treatment, but could recur. *Id.* He prescribed a topical steroid and advised Plaintiff to follow up if the condition failed to improve. *Id.*

On March 6, 2012, Plaintiff reported pain with repetitive lifting. Tr. at 404. Her blood pressure was elevated at 132/88 mm/Hg. *Id.* Ms. Stoller described Plaintiff's mood and affect as anxious and sad, but stable. *Id.* She advised Plaintiff to go home to rest, to

increase her water intake, and to continue to take her blood pressure medication as directed. Tr. at 405.

Plaintiff presented to Rebecca Holdren, M.D. ("Dr. Holdren"), for an initial pain management visit on March 28, 2012. Tr. at 336. She reported generalized pain and fibromyalgia. *Id.* She complained of constant pain that she rated as a 10 on a 10-point scale. *Id.* Dr. Holdren observed Plaintiff to have generalized moderate tenderness over her bilateral hands and knees. Tr. at 338–39. She noted generalized moderate crepitation in the bilateral knees; muscle spasms in the upper and lower back; and tenderness in the bilateral upper and lower paraspinal muscles. Tr. at 339. She stated Plaintiff demonstrated restricted ROM of her bilateral shoulders; an antalgic gait; and 16 of 18 fibromyalgia tender points. *Id.* She assessed myalgia and myositis; malaise and fatigue; and chronic pain syndrome. *Id.* She recommended that Plaintiff consider Savella after her blood pressure improved. *Id.* She prescribed Zanaflex and a transcutaneous electrical nerve stimulation ("TENS") unit. Tr. at 340.

On April 9, 2012, an MRI of Plaintiff's cervical spine showed C4-5 left paracentral disc herniation with mild cord displacement. Tr. at 555. Radiologist Timothy P. Close, M.D. ("Dr. Close"), indicated there was no evidence of definite cord compression or edema and only mild degenerative disc changes. *Id.*

On April 17, 2012, Plaintiff's blood pressure was elevated at 152/92 mm/Hg in her left arm and 152/96 mm/Hg in her right arm. Tr. at 407. Ms. Stoller observed Plaintiff to have stable mood and affect. *Id.* She indicated Plaintiff's blood pressure was stable and that she should continue her current medications. *Id.*

On April 25, 2012, Plaintiff reported that her medication was not very helpful and that Zanaflex caused her to feel sleepy. Tr. at 349. She indicated she could "barely work" because of pain and fatigue. *Id.* Dr. Holdren observed Plaintiff to have generalized mild tenderness in her hands and knees; tenderness in her bilateral upper and lower paraspinal muscles; restricted ROM of her bilateral shoulders; forward-flexed posture; and antalgic gait. Tr. at 351–52. She assessed chronic pain syndrome; myalgia and myositis; malaise and fatigue; sciatica; and cervical disc displacement/neuritis/anterior cervical discectomy and fusion. Tr. at 352. She stated she was "[n]ot sure if [Plaintiff] wants pain mngt or seeking disability primarily." *Id.* She prescribed Baclofen and indicated Plaintiff could try Savella if her primary care physician indicated her blood pressure was stable. *Id.*

On May 1, 2012, an MRI of Plaintiff's lumbar spine was essentially normal. Tr. at 354.

On May 21, 2012, Plaintiff indicated that Baclofen caused sleepiness and weakness in her arms. Tr. at 355. She stated she had been unable to continue physical therapy because of her work schedule. *Id.* Dr. Holdren noted findings similar to those during prior visits. Tr. at 357–58. She prescribed Butrans patches. Tr. at 358.

On June 21, 2012, Plaintiff complained that the Butrans patches were causing drowsiness and nausea. Tr. at 360. Dr. Holdren indicated Plaintiff was unable to take Savella because her blood pressure was 150/90. *Id.*

Plaintiff presented to Ms. Stoller on June 21, 2012, to request that Xanax be refilled. Tr. at 409. She stated her anxiety had increased because her mother was under hospice care. *Id.* She indicated that she suspected Enalapril was causing her lips to swell.

*Id.* Ms. Stoller observed Plaintiff to have appropriate mood and affect. *Id.* She discontinued Enalapril and prescribed Diovan. Tr. at 410.

On July 31, 2012, Plaintiff reported that her medication was providing some relief, but caused nausea. Tr. at 365. She indicated her stress level had increased because her mother had recently passed away. *Id.* She complained of hand pain that was caused by repetitive activity in her job. *Id.* Dr. Holdren described Plaintiff's mood and affect as apathetic and flat. Tr. at 367. She noted generalized mild-to-moderate tenderness over Plaintiff's bilateral hands and knees; generalized moderate crepitation in her knee area; muscle spasms in her upper and lower back; bilateral upper and lower paraspinal muscle tenderness; forward-flexed body posture; and antalgic gait. Tr. at 367–68. She indicated Plaintiff had been unable to afford a work assessment. Tr. at 368. She ordered a TENS unit. Tr. at 369.

Plaintiff denied side effects from Diovan, but indicated her blood pressure continued to be elevated on August 7, 2012. Tr. at 412. She complained of pain, fatigue, and stress. *Id.* Ms. Stoller indicated Plaintiff's blood pressure was elevated at 148/86 mm/Hg. Tr. at 413. She increased Plaintiff's dosage of Diovan to 160 mg. *Id.*

On August 15, 2012, Plaintiff rated her pain as a 10 on a 10-point scale without medication and an eight with medication. Tr. at 370. She reported constant pain throughout her body, but indicated she was continuing to work. *Id.* Ryan Groth, PA-C's ("Mr. Groth's"), observations were similar to those of Dr. Holdren during prior examinations. Tr. at 372–73. He noted that Plaintiff had a conflict with Dr. Holdren's

nurse and would be transferred to Dwight A. Jacobus, D.O. ("Dr. Jacobus"), for treatment. Tr. at 374.

Plaintiff complained of body aches and elevated blood pressure on August 23, 2012. Tr. at 415. Her blood pressure was 146/90 mm/Hg. Tr. at 416. Ms. Stoller instructed Plaintiff to continue to take Diovan and to follow up in four weeks. *Id.*

Plaintiff presented to Ms. Stoller for a blood pressure check on August 28, 2012. Tr. at 417. She continued to complain that her blood pressure was elevated on days that she worked. *Id.* Her blood pressure was 140/90 mm/Hg. Tr. at 418. Ms. Stoller observed Plaintiff to be oriented with appropriate mood and affect. *Id.* She indicated an impression of benign essential hypertension and instructed Plaintiff to continue to take Diovan. *Id.*

Plaintiff presented to Jed A. Graham, M.D. ("Dr. Graham"), on September 19, 2012. Tr. at 461. She complained of fatigue and constant cramping in her right upper and lower extremities. *Id.* Dr. Graham observed Plaintiff to have tenderness and muscle spasms in her neck and shoulders; 4/5 strength in her upper extremities; decreased ROM in her neck; and decreased reflexes in her upper extremities. Tr. at 462–63. He indicated Plaintiff was able to ambulate without difficulty. Tr. at 462. He recommended physical therapy and cervical traction; prescribed Prednisone; and instructed Plaintiff to obtain blood work and to follow up in a month. Tr. at 463.

On October 9, 2012, Plaintiff reported that she had last worked on October 3, 2012, and had been approved for disability benefits. Tr. at 420. She indicated her fatigue was "about the same" or "[m]aybe a little worse." *Id.* She stated she had stopped taking

Lexapro. *Id.* Ms. Stoller noted that Plaintiff's blood pressure was improved at 126/94 mm/Hg. Tr. at 421.

On October 16, 2012, Dr. Graham indicated he "found that [Plaintiff] had a herniated disc with mild cord displacement" and that he suspected "most of her physical symptoms [were] related to a herniated disc." *Id.* He indicated it was likely that Plaintiff's fatigue was related to estrogen deficiency. Tr. at 456. Dr. Graham observed Plaintiff to have no problem with ambulation. Tr. at 457. He noted Plaintiff had multiple muscle spasms and areas of tenderness in her neck and shoulders; decreased ROM of her neck; 4/5 upper extremity strength; decreased abduction in her bilateral arms; and decreased reflexes. Tr. at 458. He assessed discogenic disease and myofascial dysfunction in the neck as a result of cord displacement and disc herniation. *Id.* He indicated Plaintiff also had endocrine dysfunction, vitamin D deficiency, and low ferritin. *Id.* He recommended a functional capacity evaluation. *Id.*

On October 22, 2012, Dr. Jacobus observed Plaintiff to have pain along the right C6 dermatome border and lumbar myospasm. Tr. at 423. He indicated Plaintiff was able to come up on her tiptoes and heels; had a negative Trendelenburg's sign; and was stable and satisfactory. *Id.* He stated the MRI of Plaintiff's cervical spine showed C5-6 changes. *Id.* He prescribed Ultram 50 mg and Lortab 5 mg and referred Plaintiff to physical therapy. *Id.*

On November 19, 2012, Dr. Jacobus indicated Plaintiff "seem[ed] to function very well" on Lortab. Tr. at 489. He stated Plaintiff was engaging in some activities. *Id.*

Plaintiff reported fatigue and myalgia on January 10, 2013. Tr. at 524. She indicated she was no longer taking Cymbalta or Wellbutrin, but felt okay. *Id.* Ms. Stoller noted no abnormalities on physical examination. Tr. at 526.

On February 21, 2013, Dr. Jacobus indicated Plaintiff's medications were working well and that she was "up and down and moving about." Tr. at 492. He noted Plaintiff's blood pressure was 138/70. *Id.* He indicated he would continue to provide conservative treatment. *Id.*

On February 28, 2013, Plaintiff's blood pressure was 124/80 mm/Hg. Tr. at 520. Ms. Stoller observed no abnormalities on physical examination. *Id.* She indicated Plaintiff's hypertension had improved and that she should continue to take Diovan. Tr. at 521.

On March 20, 2013, Plaintiff rated her pain as a five with medication and an eight without medication. Tr. at 493. She complained of drowsiness as a side effect of her medications. *Id.* Dr. Jacobus prescribed Hydrocodone-Acetaminophen 5-325 mg and Ultram 50 mg. Tr. at 494.

Plaintiff presented to Bruce Kofoed, M.D. ("Dr. Kofoed"), for a consultative examination on April 25, 2013. Tr. at 497. She complained of pain, tenderness, and soreness throughout her body. *Id.* She reported increased anxiety and decreased interest and participation in social activities. *Id.* Dr. Kofoed observed that Plaintiff was appropriately dressed and groomed; ambulated without an assistive device; sat for 45 minutes without requesting a break; and demonstrated a depressed mood and a flat affect. Tr. at 498. He indicated Plaintiff put forth good effort on tasks and was oriented in all

spheres. *Id.* He stated Plaintiff worked slowly and struggled with serial seven subtractions. *Id.* He indicated she was able to remember three of four items directly and the last one with a prompt. *Id.* Dr. Kofoed observed that Plaintiff had a history of functioning within the average range of intellectual ability, but that her cognitive screening task suggested slow processing and possibly poor tracking in concentration on serial sevens. Tr. at 499. He indicated Plaintiff had fair recall for verbal and nonverbal information. *Id.* He diagnosed depression associated with general medical conditions and generalized anxiety, not otherwise specified ("NOS"). *Id.* He stated Plaintiff was capable of managing funds independently. Tr. at 500.

On April 30, 2013, state agency consultant Xanthia Harkness, Ph. D. ("Dr. Harkness"), reviewed the evidence and completed a psychiatric review technique ("PRT"). Tr. at 85–86. She considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and determined that Plaintiff had mild restriction of activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* She concluded "[t]he preponderance of evidence indicates that the claimant has severe mental impairments that would not preclude the ability to carry out simple, unskilled tasks in a setting that does not require frequent public contact." Tr. at 86.

Dr. Harkness indicated in a mental residual functional capacity ("RFC") assessment that Plaintiff was moderately limited with respect to the following abilities; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; and to interact appropriately

with the general public. Tr. at 91. She specified that Plaintiff retained abilities to remember location and work-like procedures; understand and remember short and simple instructions; carry out simple instructions; attend to and perform simple tasks without special supervision for at least two-hour periods; understand normal work-hour requirements and be prompt within reasonable limits; work in proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruption from symptoms or the need for an unreasonable number of rest or cooling off periods; ask simple questions and request assistance from peers or supervisors; sustain appropriate interaction with peers and coworkers; sustain socially-appropriate work behavior, standards, and appearance; respond appropriately to changes in a routine work setting; be aware of personal safety and avoid work hazards; travel to and from work using available transportation; and set goals. Tr. at 92–93.

State agency medical consultant Adrian Corlette, M.D. ("Dr. Corlette"), reviewed the record and completed a physical RFC assessment on May 9, 2013. Tr. at 88–91. He indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance and stoop; occasionally kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently reach overhead, handle, and finger with the bilateral upper extremities; and avoid concentrated exposure to machinery and unprotected heights. *Id.* A second state agency medical consultant, Dale Van Slooten,

M.D. ("Dr. Van Slooten"), assessed the same physical RFC on July 25, 2013. *Compare* Tr. at 88–91, *with* Tr. at 106–09.

Plaintiff presented to Carlee Groomes, PA-C ("Ms. Groomes"), for pain management on June 19, 2013. Tr. at 502. She denied side effects and reported her medication regimen was working well. *Id.* However, she rated her pain as a 10 before medication and an eight after medication. *Id.* She particularly complained of bilateral hand pain with grip weakness. Tr. at 503. Ms. Groomes noted no abnormalities on physical examination. *Id.* She indicated Plaintiff's conditions appeared to be stable. *Id.*

On July 9, 2013, Plaintiff reported that her neck pain was exacerbated by sitting and lying down. Tr. at 514. Her blood pressure was 140/100 mm/Hg. Tr. at 515. Ms. Stoller observed no abnormalities on physical examination. Tr. at 515–16. She continued Plaintiff's medications and advised her to follow up in three months. Tr. at 518.

Plaintiff presented to John L. Sanders, M.D. ("Dr. Sanders"), for constant bilateral hand pain with episodic numbness on July 17, 2013. Tr. at 509. Dr. Sanders observed no obvious soft tissue swelling or deformity of the hands. *Id.* He indicated direct compression test was positive, but Tinel's and Phalen's tests were negative on the right. *Id.* He stated direct compression and Phalen's tests were negative on the left, but Tinel's test was positive. *Id.* Plaintiff was able to grip 25 pounds on the right and 20 pounds on the left. *Id.* Dr. Sanders reviewed Plaintiff's nerve conduction studies and MRI report and indicated impressions of bilateral hand pain, bilateral borderline carpal tunnel syndrome, history of C5-6 cervical disc disease, and history of fibromyalgia. *Id.* He noted that Plaintiff's complaints were fairly diffuse and could not be explained by carpal tunnel

15

syndrome. Tr. at 510. He discussed treatment options with Plaintiff, and she opted to proceed with wrist splinting. *Id.*

On July 30, 2013, state agency psychological consultant Craig Horn, Ph. D. ("Dr. Horn"), considered Listings 12.04 and 12.06 and assessed the same level of restriction and the same mental RFC as Dr. Harkness. *Compare* Tr. at 104–05 and 109–11, *with* Tr. at 85–86 and 91. He also stated Plaintiff retained the same abilities that Dr. Harkness indicated. *Compare* Tr. at 111, with Tr. at 92–93.

On September 3, 2013, Plaintiff followed up with Ms. Stoller for hypertension. Tr. at 511. She reported that she checked her blood pressure in stores and that it had decreased since she stopped working. *Id.* Her blood pressure was 138/84 mm/Hg. Tr. at 512. Ms. Stoller noted no abnormalities on physical examination. *Id.* She indicated Plaintiff's blood pressure had improved and that she could try Lyrica. Tr. at 513.

On October 3, 2013, Plaintiff indicated she had been unable to fill the prescription for Lyrica because her insurance would not cover it. Tr. at 536. Jeffrey Lawson, M.D. ("Dr. Lawson"), noted that x-rays of Plaintiff's hands were normal and that her rheumatoid factor and anti-Cyclic Citrullinated Peptide ("CCP") antibodies were normal. *Id.* He stated Plaintiff did not appear to have rheumatoid arthritis, but "continues to have fibromyalgia." *Id.* He observed no swelling or deformities on a musculoskeletal examination. *Id.* Plaintiff endorsed pain in her left metacarpophalangeal joints, her bilateral trapezii, and her bilateral supraspinati, but all other joints were normal. *Id.* Dr. Lawson refilled Plaintiff's prescriptions for Hydrocodone-Acetaminophen and Ultram. *Id.*

Plaintiff reported that her medication was working well and denied side effects on December 5, 2013. Tr. at 553. Dr. Jacobus noted no abnormalities on examination. *Id.*

Plaintiff reported feeling well on December 10, 2013, but complained of decreased energy. Tr. at 539. Ms. Stoller observed Plaintiff to have full ROM of her neck; no edema; normal gait; normal reflexes; and normal joints and muscles in her musculoskeletal spine. Tr. at 540–41. She indicated Plaintiff was improving because she was no longer in a stressful environment. Tr. at 542.

On April 2, 2014, Plaintiff reported pain in her low back, neck, and bilateral knees, feet, arms, and hips. Tr. at 549. She denied problems with sleep and indicated her medications were working well. *Id.* Ms. Groomes observed Plaintiff to be ambulating normally; to have normal mood and affect; to be active and alert; to demonstrate full ROM of her neck; and to have a normal neurological examination. Tr. at 551. She indicated Plaintiff's pain was stable and recommended an MRI of her cervical spine to reevaluate the extent of her cervical degenerative disc disease. *Id.*

On May 21, 2014, Dr. Jacobus noted that Plaintiff was "doing very well with her medication." Tr. at 545. He observed Plaintiff to have some myospasm in her cervical spine and some discomfort over her left shoulder, but indicated the physical examination was otherwise unremarkable. *Id.* He stated an MRI of Plaintiff's cervical spine showed a small sub-ligamentous disc herniation to the left of the midline and minimal foraminal stenosis at C4-5. *Id.* He refilled Plaintiff's medications and instructed her to follow up in a month. *Id.*

On July 15, 2014, Plaintiff indicated that her pain had decreased and her anxiety had improved since she stopped working. Tr. at 560. She stated she was "able to control what and how much" she did. *Id.* She reported that she was walking for exercise. *Id.* She indicated she would take half of a Xanax tablet up to two times per week to sleep. *Id.* Ms. Stoller noted no abnormalities on physical examination and found that Plaintiff had the "ability to recall recent and remote events," an intact fund of knowledge, normal attention span, and a normal ability to concentrate. Tr. at 561–62.

On July 17, 2014, Dr. Jacobus indicated Plaintiff's medications were working well and that she was getting up and down and moving about. Tr. at 570. He observed Plaintiff to have myospasm of the lumbar region and slightly-reduced bilateral side bending, but to have an otherwise normal examination. *Id.*

Plaintiff reported left kidney pain and swelling in her back on August 5, 2014. Tr. at 556. She also complained of left upper quadrant pain associated with diarrhea. *Id.* Plaintiff's blood pressure was elevated at 152/86, but Ms. Stoller noted no additional abnormalities on examination. Tr. at 557. Ms. Stoller indicated Plaintiff's urine was clear and that her symptoms were most likely caused by irritable bowel syndrome ("IBS"). Tr. at 558. She encouraged Plaintiff to increase her fiber and water intake and to exercise. *Id.*

Plaintiff reported pain throughout her body on August 14, 2014. Tr. at 563. She indicated Hydrocodone-Acetaminophen was not working well. Tr. at 566. Dr. Jacobus noted that Plaintiff "still shows a lot of lumbosacral myositis, lumbago, irritation, radiculopathy, and any type of repetitious activities are bothering her quite a bit." *Id.* He increased Plaintiff's Hydrocodone-Acetaminophen dosage to 7.5/325 mg. *Id.*

18

On September 17, 2014, Plaintiff indicated her medications were working well. Tr. at 580. Dr. Jacobus noted no abnormalities on physical examination. *Id.*

Plaintiff complained of a recent worsening of bilateral knee pain on November 12, 2014. Tr. at 577. She indicated she was not taking her medication as often as it was prescribed. *Id.* Dr. Jacobus declined to refill Plaintiff's medications "as patient has 1 prescription of each of the Tramadol and Hydrocodone at the Pharmacy." Tr. at 578.

On January 8, 2015, Dr. Jacobus indicated Plaintiff was tolerating her medication well with no new issues. Tr. at 572. Plaintiff rated her pain as a three on a 10-point scale with medication. *Id.* Dr. Jacobus indicated Plaintiff had crepitus in both knees and 1+ effusion on the right. Tr. at 575. He recommended Plaintiff obtain an MRI of her knees. *Id.*

C.      The Administrative Proceedings

1.      The Administrative Hearing

a.      Plaintiff's Testimony

At the hearing on February 27, 2015, Plaintiff testified that she last worked on October 4, 2012. Tr. at 43. She indicated she had worked for the United States Postal Service ("USPS") for 19 years. Tr. at 44. She stated she stopped working because of chronic pain and high blood pressure. *Id.*

Plaintiff testified that she had visited three rheumatologists before being diagnosed with chronic pain. Tr. at 46. She stated her doctors had prescribed medications for fibromyalgia, but Savella had upset her stomach and she was unable to afford Lyrica. *Id.* She indicated she experienced bilateral knee pain that was exacerbated by walking. Tr. at

49. She stated she experienced constant pain throughout her body. Tr. at 55. She testified that she had degenerative disc disease in her neck that radiated down her arm and back. Tr. at 49.

Plaintiff stated she experienced pain in her hands when she attempted to lift a five-pound bag of sugar. Tr. at 51. She indicated she would be unable to use her hands repetitively. Tr. at 51–52. She stated nerve conduction studies had shown mild carpal tunnel syndrome. Tr. at 52.

Plaintiff testified that she experienced symptoms of IBS every day or two that caused her to visit the restroom four or five times. Tr. at 53. She indicated she had taken medication for IBS at one time, but it had been ineffective. Tr. at 54. She stated her pain medications made her more comfortable, but did not completely alleviate her pain. Tr. at 55.

Plaintiff endorsed symptoms of anxiety and panic attacks. Tr. at 56. She stated her anxiety-related symptoms were better controlled because she was no longer working in a stressful environment. Tr. at 57. She indicated her panic attacks did not seem to be triggered by anything in particular and would be a problem even if she were not working in a stressful job. *Id.* She stated she had some difficulty remembering things and remaining focused. Tr. at 60–61. She indicated she had been diagnosed with Adie Syndrome, which caused her to sweat profusely. Tr. at 61. She stated that stress caused her blood pressure to become elevated. Tr. at 62.

Plaintiff estimated that she could stand for an-hour-and-a-half to two hours during an eight-hour workday. Tr. at 54. She indicated she could barely walk if she overexerted herself. Tr. at 56.

Plaintiff testified that she lived with her husband and adult son. Tr. at 41. She indicated she sometimes walked three laps on the track at the YMCA for exercise. Tr. at 48. She indicated she was no longer able to clean or go shopping like she had in the past. Tr. at 55–56.

b.      Vocational Expert Testimony

Vocational Expert ("VE") Jacqueline Kennedy-Merritt reviewed the record and testified at the hearing. Tr. at 63–69. The VE categorized Plaintiff's PRW as a mail handler, *Dictionary of Occupational Titles* ("*DOT*") number 209.687-014, as requiring light exertion and having a specific vocational preparation ("SVP") of two. Tr. at 64. She indicated Plaintiff had no transferable skills from her PRW. Tr. at 65. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the light exertional level with the following additional restrictions: frequently pushing and pulling with the bilateral upper extremities; never climbing ladders, ropes, or scaffolds; occasionally kneeling, crouching, crawling, and climbing ramps and stairs; frequently reaching overhead, handling, fingering, balancing, and stooping; occasionally being exposed to extreme cold, extreme humidity, and hazards associated with unprotected, dangerous machinery and unprotected heights; and able to understand, remember, and carry out simple, routine tasks in a low-stress work environment. *Id.* He defined a low-stress work environment as being free of fast-paced or team-dependent production

requirements; involving simple work related-decisions; and having only occasional workplace changes. *Id.* He further limited the individual to less than occasional interaction with the general public and occasional interaction with coworkers and supervisors. Tr. at 65–66. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 66. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified jobs at the light exertional level with a specific vocational preparation ("SVP") of two as a router, *DOT* number 222.587-038, with 60,000 positions in the national economy; a marker, *DOT* number 209.587-034, with 150,000 positions in the national economy; and a stocker checker, *DOT* number 299.667-014, with 5,000 positions in the national economy. *Id.*

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who could perform work as described in the first question, but was limited to occasional bilateral overhead reaching, handling, and fingering. *Id.* He asked if there would be any jobs that the individual could perform. Tr. at 67. The VE identified the job of final inspector, *DOT* number 727.687-054, with 21,000 positions in the national economy, but indicated she was unable to identify any other jobs that would allow for those restrictions. *Id.*

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who could perform work as described in the first and second questions, but could only maintain consistent concentration, attention, and pace

for 75 percent of the workday. *Id.* He asked if the individual would be able to perform any work. Tr. at 68. The VE testified that no work would be available. *Id.*

The VE testified that her testimony regarding time off task, absenteeism, and reaching was based on her knowledge and experience. Tr. at 68–69. She indicated her testimony did not conflict with the *DOT*, but pertained to restrictions that the *DOT* did not directly address. Tr. at 69.

### 2. The ALJ's Findings

In his decision dated April 9, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
2. The claimant has not engaged in substantial gainful activity since December 3, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: cervical degenerative disc disease; polyarthralgia; hypertension; affective disorder and anxiety disorder (20 CFR 404.1520(c)).
4. The claimant also has the following non-severe impairments: irritable bowel syndrome, borderline obesity, and dermatitis (20 CFR 404.1521 and 416.921).
5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
6. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). In particular, the claimant can lift up to 20 pounds occasionally and 10 pounds frequently. She can stand or walk for approximately 6 hours in an 8-hour workday and sit for approximately 6 hours of an 8-hour workday with normal breaks. The claimant is limited to frequent bilateral upper extremity pushing and pulling. She can never climb ladders, ropes or scaffolds, can occasionally climb ramps and stairs, kneel, crouch and crawl, and can frequently balance and stoop. She is limited to frequent bilateral overhead reaching, handling, and fingering, with occasional exposure to extreme cold, humidity and hazards associated with

unprotected heights. She is able to understand, remember and carry out simple, routine tasks in a low stress work environment (defined as being free of fast-paced or team-dependent production requirements), involving simple work-related decisions and occasional work place changes. Work can be performed with less-than-occasional interaction with the general public, and occasional interaction with co-workers and supervisors.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8. The claimant was born on December 3, 1962 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from December 3, 2012, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 12–27.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not properly consider Plaintiff's diagnosis of fibromyalgia;

2) the ALJ did not adequately evaluate opinions from Plaintiff's treating medical sources;

3) the ALJ mischaracterized Plaintiff's ADLs and did not adequately consider her pain;

4) the ALJ ignored statements from Plaintiff's coworkers and friends that supported her claim;

5) the ALJ disregarded evidence of hypertension, anxiety, and disc herniation and degenerative disc disease in her cervical spine; and

6) current findings support Plaintiff's alleged impairments.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

_____

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward

---

assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Fibromyalgia

Plaintiff argues the ALJ did not adequately consider her diagnosis of fibromyalgia. [ECF No. 30-3 at 2–3]. The Commissioner did not specifically address the diagnosis of fibromyalgia, but maintains the ALJ accounted for Plaintiff's work-related limitations that were supported by the record. [ECF No. 31 at 13].

The Social Security Administration ("SSA") published SSR 12-2p to provide guidance on how it develops evidence to establish and evaluate a medically-determinable impairment of fibromyalgia. SSR 12-2p, 2012 WL 3104869. The ruling provides that a claimant may establish fibromyalgia as a medically-determinable impairment through evidence from an acceptable medical source. *Id.* at *2. ALJs should not rely on the physician's diagnosis alone, but should review the evidence to determine if the claimant's medical history and physical examinations are consistent with the diagnosis and with the physician's statements regarding the claimant's physical strength and functional abilities. *Id.* The ruling requires that a claimant's diagnosis of fibromyalgia be confirmed through

either the *1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia* ("1990 ACR Criteria") or the *2010 ACR Preliminary Diagnostic Criteria* ("2010 ACR Criteria"). *Id.* at *2–3.

The 1990 ACR Criteria are as follows:

1)     A history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.

2)     At least 11 positive tender points on physical examination . . . The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist . . .

3)     Evidence that other disorders that could cause the symptoms or signs were excluded . . . .

*Id.* at *2–3.

To establish a diagnosis under the 2010 ACR Criteria, the claimant must have a history of widespread pain; repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions; and evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. *Id.* at *3. Fibromyalgia symptoms and signs that may be considered include muscle pain, IBS, fatigue or tiredness, thinking or memory problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste,

seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms. *Id.* at *3 n.9. Co-occurring conditions include IBS, depression, anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint ("TMJ") disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome. *Id.* at *3 n.10.

The ALJ addressed the alleged impairment of fibromyalgia, but found the record did not support the existence of fibromyalgia as a medically-determinable impairment. Tr. at 14. He indicated the record did not contain "evidence showing that the claimant exhibits the symptoms associated with the impairment." *Id.* He stated the record did not confirm that Plaintiff had "the requisite number of tender point findings (or any tender points) on an ongoing basis and there is no evidence that medical doctors have excluded other impairments as required in SSR 12-2p." *Id.* He indicated the diagnosis of fibromyalgia did not "comport with the requirements set forth in either SSR 12-2p or 96-4p" that an impairment "result from anatomical, physiological or psychological abnormalities that can be show by medically acceptable clinical and laboratory diagnostic techniques." *Id.*

It appears the ALJ considered the 1990 ACR criteria to some extent. *Compare* Tr. at 14 (stating that the evidence did not indicate Plaintiff had the requisite number of tender points), with , 2012 WL 3104869 at *3 (providing that 1990 ACR Criteria require

at least 11 positive tender points).[5] However, it does not appear the ALJ thoroughly considered whether the record established a medically-determinable impairment of fibromyalgia under the 2010 ACR Criteria.

The evidence arguably supports a medically-determinable impairment of fibromyalgia based on the 2010 ACR Criteria. Plaintiff reported "[a] history of widespread pain" during multiple medical visits. *See* Tr. at 263 (indicating a history of generalized aches and pains), 288 (complaining of pain "all over" her body), 296 (stating it was clear that Plaintiff suffered from a long-standing pain disorder), 311 (reporting a 13-year history of arthralgia and myalgia that had worsened over the prior two-year period), and 370 and 497 (indicating constant pain throughout her body).

The record suggests Plaintiff had more than six fibromyalgia symptoms, signs, or co-occurring conditions. She had evidence of muscle pain on multiple occasions. *See* Tr. at 339, 352, and 368 (noting muscle spasms in the upper and lower back and tenderness in the bilateral upper and lower paraspinal muscles) and Tr. at 458 and 463 (observing multiple muscle spasms throughout Plaintiff's trapezii and rhomboids and tenderness over her rhomboids and scapulae). The record suggests a diagnosis of IBS. *See* Tr. at 53, 205, and 558. Plaintiff often complained of fatigue or tiredness. *See* Tr. at 288, 311, 314, 339, 349, 412, et al. While Plaintiff did not consistently present with problems thinking or remembering, there was evidence of some difficulty with these functions. *See* Tr. at 91

---

[5] Plaintiff correctly notes that Dr. Holdren's records indicate she had 16 of 18 fibromyalgia tender points. *See* Tr. at 339, 353, 358, 363, 368, and 373. However, because Dr. Holdren's records do not contain evidence of testing that established those 16 tender points, they are not sufficient to support a medically-determinable impairment of fibromyalgia under the 1990 ACR Criteria. *See* SSR 12-2p.

(indicating Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods), 265 (noting Plaintiff had some difficulty concentrating and a somewhat scattered thought process), 376 (stating Plaintiff had memory loss and inability to concentrate), and 499 (observing that Plaintiff demonstrated poor tracking in concentration on serial sevens). Plaintiff complained of numbness and tingling on a couple of occasions (Tr. at 311 and 509), and Dr. Jacobus indicated numbness and tingling were among her symptoms (Tr. at 533). Ms. Stoller indicated Plaintiff suffered from insomnia. Tr. at 315. The record suggests Plaintiff experienced hair loss. Tr. at 204 and 298. She complained of depressive symptoms and was diagnosed with depression. *See* Tr. at 265, 272, 311, 499, and 529. She reported symptoms of anxiety and was diagnosed with an anxiety disorder. *See* Tr. at 56, 85–86, 265, 376, 399, 409, 497, 499, 533, and 560. Ms. Stoller suggested that Plaintiff had TMJ. *See* Tr. at 272. The record also contains some evidence that Plaintiff experienced non-restorative sleep. *See* Tr. at 263 and 314. Although the record indicates Plaintiff had more than six symptoms, signs, or co-occurring conditions that would support a diagnosis of fibromyalgia, it is necessary for the finder of fact to determine whether she had repeated manifestations of them during the relevant period, as required for a diagnosis of fibromyalgia under the 2010 ACR Criteria.

The ALJ's finding that Plaintiff's doctors had not excluded other impairments before diagnosing fibromyalgia is not wholly supported by the record. "Some examples of other disorders that may have symptoms or signs that are the same or similar to those resulting from FM include rheumatologic disorders, myofascial pain syndrome,

polymyalgia rheumatic, chronic Lyme disease, and cervical hyperextension-associated or hyperflexion-associated disorders." 2012 WL 3104869 at *3 n.7. Both the 1990 and 2010 ACR Criteria require "[e]vidence that other disorders that could cause the symptoms or signs were excluded," but they do not specify how many other disorders must be excluded for the diagnosis of fibromyalgia to be deemed valid. *See* 2012 WL 3104869 at *3. Although the record does not show that Plaintiff's physicians ruled out all other potential impairments, it does suggest that they ruled out several alternative diagnoses. On May 19, 2011, Dr. Hill, a rheumatologist, ruled out rheumatoid arthritis as a possible diagnosis based on the absence of swelling on physical examination. Tr. at 314. She indicated a diagnosis of fibromyalgia should be considered because of the presence of tender points and Plaintiff's complaints of non-restorative sleep and fatigue. *Id.* On February 9, 2012, another rheumatologist, Dr. Lipsey concluded that Plaintiff had no signs of active inflammatory polyarthritis. Tr. at 290. On October 3, 2013, a third rheumatologist, Dr. Lawson, noted that Plaintiff's rheumatoid factor was normal and indicated Plaintiff had fibromyalgia—not rheumatoid arthritis. Tr. at 536. If the ALJ felt that Plaintiff's physicians had not adequately ruled out other disorders, he could have supplemented the record by re-contacting Plaintiff's medical providers, obtaining additional existing records, or referring her for a consultative examination. *See id.* at *4. However, he failed to avail himself of these options and concluded—despite evidence to the contrary—that there was "no evidence" that Plaintiff's physicians had ruled out other impairments.

In light of the foregoing, the undersigned recommends the court find the ALJ did not adequately comply with the provisions of SSR 12-2p in determining whether Plaintiff had a medically-determinable impairment of fibromyalgia.

2.      Treating Physicians' Observations and Opinions

Plaintiff argues the ALJ did not adequately consider the observations and opinions of her treating physicians. [ECF No. 30-2 at 2]. The Commissioner maintains that the ALJ was not required to accept Plaintiff's treating medical providers' opinions that she could not perform any work because their conclusions were inconsistent with the conservative treatment history. [ECF No. 31 at 10].

ALJs "must always carefully consider medical source opinions about any issue." SSR 96-5p. Medical opinions are statements from acceptable medical sources[6] "that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, quoting 20 C.F.R. § 404.1527(a).

ALJs are directed to accord controlling weight to medical opinions from treating sources that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2). However, an ALJ may decline to give controlling

---

[6] Acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a); SSR 06-3p. Medical and psychological providers who are not acceptable medical sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. 20 C.F.R. § 404.1513(d).

weight to medical opinions from treating sources that are not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or that are inconsistent with the other substantial evidence of record. SSR 96-2p.[7] The ALJ must "always give good reasons" for the weight he accords to a medical opinion from a treating source. 20 C.F.R. § 404.1527(c)(2). If the ALJ issues a decision that is not fully favorable, his "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." SSR 96-2p.

If the ALJ declines to accord controlling weight to a treating physicians' medical opinion, he must weigh all the medical opinions of record based on the factors in 20 C.F.R. § 404.1527(c). *Id.*; SSRs 96-2p and 96-5p. These factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

---

[7] SSR 96-2p was recently rescinded, but the change only affects claims filed on or after March 27, 2017. Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. REg 15,263 (Mar. 27, 2017).

Although ALJs are not required to explicitly consider the criteria in 20 C.F.R. § 404.1527(c) in evaluating opinions from providers who do not qualify as acceptable medical sources, their decisions should indicate they were guided by these factors. SSR 06-3p. "Thus, a distinction may be drawn between the ALJ's requirement to consider opinions from other sources and his need to explain in his decision the weight accorded to opinions from acceptable medical sources, but the ALJ 'generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.'" *Dutton v. Colvin*, No. 1:14-1779-BHH-SVH, 2015 WL 1733799, at *13 (D.S.C. Apr. 16, 2015), citing SSR 06-3p.

A reviewing court should not disturb an ALJ's determination as to the weight to be assigned to a medical opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

In view of the foregoing authority, the undersigned considers Plaintiff's arguments regarding the ALJ's evaluation of the medical opinion evidence of record.

### a.     Dr. Mullen

The Commissioner contends the ALJ gave reduced weight to Dr. Mullen's opinion because it predated Plaintiff's alleged onset date by more than a year and conflicted with

her failure to obtain any subsequent mental health treatment and her ability to work for more than a year thereafter. [ECF No. 31 at 10].

On July 14, 2011, Dr. Mullen indicated the following:

Ms. Hunter has reached the end of her abilities to work at the United States Post Office. The atmosphere is too burdened with stress for her to stand it anymore. Even going to work raises her blood pressure and makes her pain worse. This, in turn, makes her anxiety and depression worse.

I believe she should have an indefinite medical leave and I think her condition will not improve at all as long as she tries to work anywhere at this point. She is not a candidate for the active work force in any capacity.

Tr. at 265–66. He noted that Plaintiff had missed four or five work days since March and indicated her absenteeism would continue to be a problem. Tr. at 266. He stated he did not think that Plaintiff should be working. *Id.*

The ALJ specified that he accorded "some weight" to Dr. Mullen's opinion in finding that Plaintiff could not return to her PRW. Tr. at 23. He credited Dr. Mullen's psychiatric specialization and the examining relationship. Tr. at 23; *see* 20 C.F.R. § 404.1527(c)(1) and (5). However, he noted that Dr. Mullen had "a limited history with the claimant." *Id.*; *see* 20 C.F.R. § 404.1527(c)(2). He gave reduced weight to Dr. Mullen's opinion based on Plaintiff's ability to work at the USPS for more than a year following the evaluation; her failure to obtain subsequent mental health treatment; her treatment with Xanax only; and evidence of improvement in her acute stress reaction following her alleged onset date. *Id.*; *see* 20 C.F.R. §404.1527(c)(4).

The undersigned notes that the ALJ did not directly address the supportability of Dr. Mullen's opinion based on his observations. *See id.*; *see also* 20 C.F.R. §

404.1527(c)(3). However, in light of the ALJ's indications that Dr. Mullen's opinion "predate[d] the alleged onset date of disability by almost a year and a half" and that Plaintiff continued to work for over a year after the opinion was rendered, it appears that he reasonably concluded that any of Dr. Mullen's observations that supported his opinion were contradicted by a record that proved Plaintiff to be able to continue to work for a significant period and to not require any substantial treatment after his evaluation. *Cf. Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (indicating that the court has traditionally excused errors as harmless where the ALJ "would have reached the same result notwithstanding" the error).

In light of the foregoing, the undersigned recommends the court find that the ALJ considered the relevant factors in 20 C.F.R. § 404.1527(c); complied with SSRs 96-2p and 96-5p; and cited substantial evidence to support his evaluation and weighing of Dr. Mullen's opinion.

b.    Ms. Stoller

The Commissioner argues Ms. Stoller's opinion was entitled to limited weight based on her status as a nurse practitioner, as opposed to an acceptable medical source; the conclusory nature of her opinion; and the inconsistency of her opinion with the conservative treatment history and minimal objective findings. [ECF No. 31 at 10–11].

On August 5, 2011, Ms. Stoller summarized Plaintiff's treatment history since November 22, 2000. Tr. at 271. She noted that Plaintiff's blood pressure readings had been elevated on work days. Tr. at 272. She indicated that Plaintiff had complied with therapy and had adequately responded to medication. *Id.* She stated "the only future

38

treatment that will give her full relief of her stress, joint pain, headaches, TMJ symptoms, and hypertension would be discontinuing her work at the US Post Office. She is unable to handle the stress this job has placed on her at this time." *Id.* She stated Plaintiff's uncontrolled hypertension was likely caused by work stress and placed her at increased risk for coronary artery disease, heart failure, stroke, peripheral arterial disease, kidney disease, and retinopathy. *Id.* She indicated Plaintiff's stress also caused fatigue, TMJ disorders, chest pain, joint pain, and depression. *Id.* She stated Plaintiff required indefinite medical leave and was not "a candidate for the active work force in any capacity." Tr. at 273.

On January 19, 2012, Ms. Stoller specified that Plaintiff was limited as follows: lifting and carrying zero to 20 pounds for six hours in an eight-hour workday; sitting for six hours in an eight-hour workday; standing for three to four hours in an eight-hour workday; walking for three to four hours in an eight-hour workday; no climbing, repetitive hand motion, grasping, kneeling, bending, stooping, twisting, pushing and pulling, or reaching/working above shoulders. Tr. at 442. She noted the restrictions were permanent. *Id.*

On August 28, 2012, Ms. Stoller indicated in a letter that Plaintiff was "100% disabled." Tr. at 376. She stated Plaintiff "suffers from Fibromyalgia and Chronic Fatigue Syndrome." *Id.* She noted Plaintiff's symptoms included severely disabling fatigue, anxiety attacks, myalgia, myositis, weakness, TMJ, chronic joint pain, memory loss, inability to concentrate, and balance problems. *Id.* She indicated Plaintiff's blood pressure was worsened by her pain. *Id.* She stated that restricting activity was "the only

way to prevent exacerbations of the fibromyalgia, chronic fatigue, hypertension." *Id.* She claimed that Plaintiff had an unpredictable ability to sustain an activity for even a few hours per day and that any prolonged activity would exacerbate her symptoms. *Id.*

On January 31, 2013, Ms. Stoller indicated Plaintiff's mental diagnosis was "Acute Reaction to Stress." Tr. at 477. She noted that Xanax had helped Plaintiff's condition and that she had not recommended psychiatric treatment. *Id.* She described Plaintiff as being oriented to time, person, place, and situation; having an intact thought process; having appropriate thought content; demonstrating a worried/anxious mood/affect; and having adequate attention/concentration and memory. *Id.* However, she also indicated poor attention/concentration "per pt." *Id.* She stated Plaintiff exhibited serious work-related limitation in function as a result of her mental condition. *Id.* She noted work stress would increase Plaintiff's blood pressure, pain, and fatigue. *Id.* She indicated Plaintiff's diagnoses included hypertension, fibromyalgia, and chronic fatigue syndrome and that her medications and their side effects would prohibit her from working. *Id.*

The ALJ noted that Ms. Stoller was not an acceptable medical source and was, therefore, unable to render a "legally acceptable medical opinion concerning disability." Tr. at 23. Nevertheless, he indicated he had "fully considered" Ms. Stoller's conclusions and found they were not supported by the medical evidence. *Id.* He stated her opinion that Plaintiff was disabled was an opinion on an issue reserved to the Commissioner. *Id.* He stated her conclusions were inconsistent with the objective findings and diagnostic tests that showed no degenerative disc disease of the lumbar spine, no significant cervical

cord impingement, and normal hands on x-ray with only borderline carpal tunnel syndrome on testing. *Id.* He further found that Ms. Stoller's opinion was inconsistent with evidence that showed Plaintiff's symptoms to have improved with medication after her alleged onset date. *Id.* He stated Ms. Stoller's opinion was unsupported by "scarce clinical findings on exam" and observations that Plaintiff was "in no acute distress with controlled hypertension and improved acute reaction to stress." *Id.* He noted Ms. Stoller's statement appeared to be based primarily on Plaintiff's subjective reports and was inconsistent with her conservative treatment course. Tr. at 24. Finally, he indicated Ms. Stoller's opinion was undermined by Plaintiff's "repeated denials of side effects from her medications." *Id.*

Although the ALJ considered Ms. Stoller's opinions based on the factors in 20 C.F.R. § 404.1527(c) and found that they were inconsistent with the other evidence of record and unsupported by her findings on examination, it does not appear that he adequately considered Plaintiff's longitudinal treatment history or whether the opinion was supported by evidence of fibromyalgia. *See* Tr. at 23–24; *see also* 20 C.F.R. § 404.1527(c)(2), (3) and (4). The ALJ cited normal findings with respect to Plaintiff's lumbar spine and minimal findings with respect to her cervical spine and hands (Tr. at 23), but Ms. Stoller did not suggest Plaintiff's limitations were caused by degenerative disc disease, spinal cord impingement, carpal tunnel syndrome, or any other hand deformity. *See* Tr. at 477 (indicating Plaintiff's diagnoses included hypertension, fibromyalgia, and chronic fatigue syndrome). The ALJ failed to consider whether the limitations Ms. Stoller indicated were consistent with evidence of fibromyalgia-related

symptoms. Pursuant to SSR 12-2p, the ALJ must "consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" Ms. Stoller's records indicate a treatment history that lasted for over a decade (Tr. at 271–73), but the ALJ did not acknowledge or consider whether her opinions were consistent with the longitudinal treatment record. *See* 20 C.F.R. § 404.1527(c)(2). Therefore, the undersigned recommends the court find the ALJ did not evaluate and weigh Ms. Stoller's opinion based on the entire record.

c.     Dr. Jacobus

The Commissioner argues the ALJ was not required to give controlling weight to Dr. Jacobus's opinions because they were unsupported by his examination reports and inconsistent with the other evidence of record. [ECF No. 31 at 11].

Dr. Jacobus assessed Plaintiff's physical ability to do work-related activities on September 25, 2013. Tr. at 529–31. He indicated Plaintiff could occasionally lift and carry up to 10 pounds, but was unable to lift and carry 11 pounds or more because of complaints of right radiculopathy, depression, and lumbar myospasm. Tr. at 529. He stated Plaintiff's complaints were validated by objective evidence on pinwheel examination, cervical MRI, and electromyography. *Id.* He estimated Plaintiff could sit for 30 minutes and stand/walk for 30 minutes in an eight-hour workday. *Id.* He indicated Plaintiff did not require the use of a cane to ambulate. *Id.* He noted Plaintiff required position changes and was unable to engage in prolonged sitting. Tr. at 530. He indicated Plaintiff could never reach in directions other than overhead and could never push/pull. *Id.* He stated Plaintiff could occasionally reach overhead, handle, finger, and feel. *Id.* Dr.

Jacobus indicated Plaintiff could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl and could occasionally balance. Tr. at 531. He stated the postural activities would increase Plaintiff's pain, myospasm, and depression. *Id.* He anticipated that Plaintiff's impairments and treatment would cause her to be absent from work more than three times per month. *Id.* He stated Plaintiff's experience of pain or other symptoms would occasionally be severe enough to interfere with attention and concentration needed to perform even simple tasks. *Id.*

Dr. Jacobus also completed a fibromyalgia RFC questionnaire. Tr. at 532–35. He indicated Plaintiff had begun treatment with him on October 8, 2012. Tr. at 532. He stated Plaintiff met the American Rheumatological criteria for a diagnosis of fibromyalgia. *Id.* He noted Plaintiff's condition was stable. *Id.* He confirmed that her condition had lasted or could be expected to last for at least 12 months. *Id.* He identified the following clinical findings as being consistent with Plaintiff's diagnoses: objective lumbar myospasm; decreased ROM of the cervical and lumbar spine; C5 and L5 radiculopathy confirmed through pinwheel examination; and increased depression noted on psychiatric evaluation. *Id.* He indicated Plaintiff's symptoms included multiple tender points, chronic fatigue, muscle weakness, numbness and tingling, anxiety, and depression. Tr. at 533. However, Dr. Jacobus denied that Plaintiff had at least 11 positive tender points on physical examination. *Id.* He indicated Plaintiff could occasionally lift 10 pounds or less, but could never lift 20 or 50 pounds. Tr. at 533–34. He noted that Plaintiff could sit for 30 minutes and stand/walk for 30 minutes in an eight-hour workday. Tr. at 534. He stated Plaintiff's impairments were reasonably consistent with

the symptoms and functional limitations described in the evaluation. *Id.* He indicated Plaintiff's experience of pain was often severe enough to interfere with attention and concentration. *Id.* He stated Plaintiff needed a job that would permit her to shift positions at will from sitting, standing, or walking. *Id.* He denied that Plaintiff required use of a cane or other assistive device. *Id.* He stated Plaintiff had significant limitations in doing repetitive reaching, handling, or fingering. Tr. at 535. He indicated Plaintiff could occasionally use her bilateral fingers and hands to perform fine manipulations and to grasp, turn, and twist objects. *Id.* He stated Plaintiff should avoid reaching with her bilateral arms. *Id.* He indicated Plaintiff's impairments were likely to produce good and bad days and would cause her to be absent from work approximately three times per month. *Id.*

The ALJ indicated he accorded "some weight" to Dr. Jacobus's opinion because he was Plaintiff's treating physician. Tr. at 24; *see* 20 C.F.R. § 404.1527(c)(2). However, he noted that Dr. Jacobus's opinions were provided on "check-box forms" and were inconsistent with each other. *Id.*; see 20 C.F.R. § 404.1527(c)(3). He further found that "such extreme limitations" were inconsistent with Plaintiff's "diagnostic exams, revealing essentially mild to, at most, moderate findings, and her objective findings showing good strength, intact sensation and no neurological deficits in the upper and lower extremities." *Id.*; *see* 20 C.F.R. § 404.1527(c)(4). He further found Dr. Jacobus's opinion to be inconsistent with Plaintiff's "reports of improvement in symptoms with medication and her daily activities, which included the ability to care for herself, drive, and perform some housework and yard work." *Id.*; *see* 20 C.F.R. § 404.1527(c)(4).

The ALJ gave reduced weight to Dr. Jacobus's opinion because he found that the supportability and consistency factors weighed against it. *See* Tr. at 24; *see also* 20 C.F.R. § 404.1527(c)(3) and (4). However, his explanation for his conclusion is flawed,particularly in light of Dr. Jacobus's status as a treating physician. Pursuant to SSR 96-2p, the ALJ could not give reduced weight to Dr. Jacobus's opinion without providing specific reasons that were supported by the record. The ALJ declared Dr. Jacobus's two opinions to be inconsistent without explanation, and the undersigned's review reveals no glaring inconsistencies between the two opinions. *Compare* Tr. at 529–31, *with* Tr. at 532–35. The ALJ failed to acknowledge that Dr. Jacobus addressed limitations imposed by fibromyalgia in the second opinion and did not consider whether the restrictions he indicated were consistent with other evidence of record concerning fibromyalgia. *See* SSR 12-2p (indicating the need to consider the longitudinal record in evaluating claims of fibromyalgia). In light of the foregoing, the undersigned recommends the court find that substantial evidence does not support the ALJ's evaluation and weighing of Dr. Jacobus's opinion.

3.      Additional Allegations of Error

Plaintiff argues the ALJ did not adequately consider the limiting effects of her pain on her ability to work. [ECF No. 30-1 at 2]. She maintains that the ALJ's description of her ADLs is inaccurate and misleading and that her ability to perform some activities on a limited basis does not show that she could complete a workday. [ECF No. 30-2 at 2]. She contends the ALJ did not properly consider statements from her former coworkers and friends that supported her claim for disability benefits. [ECF Nos. 30-4 at 1 and 30-7

at 2]. She claims the ALJ ignored her blood pressure readings, indications of anxiety, and MRI evidence of degenerative disc disease. [ECF No. 30-5 at 1–4]. Finally, she maintains that recent records support her alleged level of impairment. [ECF No. 30-6 at 1–15].

Having found remand appropriate based on the ALJ's failure to adequately consider Plaintiff's fibromyalgia diagnosis and the opinions of Dr. Jacobus and Ms. Stoller, the undersigned declines to address Plaintiff's additional allegations of error. However, the undersigned notes that it may be necessary for the ALJ to reevaluate Plaintiff's subjective complaints and the lay witness opinions after reexamining her fibromyalgia diagnosis and the medical opinion evidence. The ALJ should also admit new evidence because the record shows Plaintiff to be insured for DIB through December 31, 2017. *See* Tr. at 12.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

August 17, 2017                                   Shiva V. Hodges
Columbia, South Carolina                          United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).